and AT&T. You may proceed. Good morning. May it please the Court. My name is Scott McCullough. I am Counsel for Petitioner in this matter. We will call Interconnect, Inc. aka Evolve Broadband. You get to start off your day today with an agency administrative law case full of technological issues. I am hopeful that we can make some of these concepts simpler for you. This case involves a challenge to an FCC decision concerning roaming. Roaming in simplest terms is basically the ability of a subscriber who is traveling outside the area served by their retail provider where that provider has no radio access network coverage to still be able to receive coverage from what is known as a host, some other carrier that has contracted with the home carrier, the retail provider, to allow the home provider's customers to roam on their radio access network. In this instance, because of the way things worked out below, Worldcall, WCX, will always be the home provider and its users will always be the roamers. For purposes of this case, we are dealing with AT&T Mobility as the host provider. AT&T has declined to use Worldcall's network for roaming purposes, so we will always be a buyer of roaming but never a seller. The Commission has had roaming rules since 1980, ever since there was cellular service. From the beginning it is recognized that roaming is essential to meet the congressional goals stated in Section 151 of the Communications Act that seamless nationwide communications by wire and radio be available to all people, including rural customers, on efficient, affordable, and fair prices. The FCC's rules as they exist today require AT&T to offer two kinds of roaming that are of note in this case. There is a third kind that we are not talking about today. We chose not to use it. It is not much used at all. First, AT&T must offer what is known as automatic roaming. Automatic roaming is involved when the customer is receiving what is called an interconnected service. In other words, something like voice or texting where the communication is originated in routing using basic telephone numbers, 10-digit telephone numbers. That is required under FCC Rule 2012A2, which defines who must offer automatic roaming. And 2012D, which defines what the obligation is. Did you raise the argument that 2012D applies before the FCC? Why has that not been waived? We did argue that 2012E applies. We sought both automatic roaming and data roaming. Our contention was that our users are going to be talking on the telephone and receiving text while they are roaming, and that is automatic roaming. We also sought the ability for our users to be able to use the Internet while they were roaming, and that is data roaming. So we sought both. Under your interpretation, would a host provider ever be governed by 2012E? Or does your reading render that provision superfluous? Can you explain how it doesn't? Of course. 2012E is known as data roaming. It is involved in what we contend to be when the end user is receiving a non-interconnected service. In this case, and for the most part, it is Internet. So when, for example, a Worldcall Interconnect customer leaves our area in between Houston, San Antonio, and Austin, and travels to, say, San Antonio or Houston, where AT&T Mobility has radio access networks, and wants to send an email or cruise the Internet, when they do that, we would be the ones supplying the Internet capability. The user would be using AT&T's radio access network, which then sends it to Worldcall Interconnect. Our contention was that when our user is using the Internet, that is data roaming. On the other hand, our contention was that when our end user is talking on the telephone or sending or receiving a text, both of which involve the use of a telephone number and is therefore interconnected, that is automatic roaming. The Commission held that automatic roaming did not apply because AT&T never provides interconnection. And we agree, AT&T will never provide the interconnection here. Indeed, it will never provide the Internet either. All that it provides is radio access network capability and routing to Worldcall. So if you follow the FCC's logic that it all turns on what the host provider is doing, then AT&T is not providing either automatic roaming or data roaming, because it does not either provide Internet or interconnection. Worldcall will always be doing so. So our contention is that it is the Commission's interpretation that renders both of these rules null. They did not apply either of them or the proper definitions. But we have background, just so we can understand the procedural context. We filed a complaint under the rules at the Commission, which was referred to the Enforcement Bureau on delegated authority. The FCC complaint rules work that way. When they implemented both the automatic roaming order, which deals with voice and texting and other interconnected data services, and the data roaming order, they said, we are going to send these things to the Enforcement Bureau. It will be handled as an adjudication. And they set out in their various orders what the criteria and consideration factors were for assessment of whether the agreement was for automatic roaming purposes, just reasonable and non-discriminatory, or for data roaming purposes, commercially reasonable. The Enforcement Bureau quickly ended up agreeing with the parties that we had some very fundamental legal disagreements about what the nature of our request was. AT&T contended that when it came to LTE, which is the next generation, the current generation of cell phone service, AT&T contended that there was no such thing as automatic roaming on its LTE network. No such thing. They said they did not have to provide automatic roaming on its LTE network, and they did not want to. This is so even though the evidence is clear that for purposes of 2012A2, AT&T does provide interconnected services, voice and texting, over its LTE network. But this case does not involve push-to-talk or text messaging. Yes, it does. This case does. It does? Yes. Roll Call expressly sought the right to obtain roaming so that its users could talk on the telephone and send and receive text while roaming. We reaffirmed that in the initial complaint, in the amended complaint, in the second amended complaint, in all of our legal analyses, and in our briefs and our application for review to the Commission. We never said we want this for Internet only, ever. We said we want both automatic roaming and data roaming. Would you agree with the Commission's, the FCC's analysis if you hadn't sought push-to-talk or text messaging? If we had sought to obtain roaming only so that our users could use the Internet while roaming, then only 2012E would have applied data roaming. Yes, but we sought both. So the analysis would have been correct? Yes, except for the fact. Except about maybe the commercially reasonable, but that's putting that to one side. I'm sorry. Go ahead. Yet another very important thing. The Commission order on review held, as a matter of fact, four times in three paragraphs, that it was basing its decision on a finding of fact that Roll Call requested and AT&T would be providing mobile broadband Internet access service as part of the arrangement. There is absolutely no evidence for that finding. In fact, all of the evidence, the uncontested evidence, is that AT&T will not be providing either Internet or interconnection. All that it will be providing is the RAN access. That was our very first point of appeal. It is a substantial or no evidence point. The Commission found four times it thought it was so important that they were going to be offering and providing and we were going to be receiving Internet when it is just simply not true. They will only be providing RAN access. That reason alone is a sufficient reason to vacate and remand because there is no substantial evidence to support that material finding that was almost the entire basis of its decision on its rationale for saying the automatic roaming rule does not apply. By way of background, because there was some confusion in the record below, the Enforcement Bureau on the automatic roaming issue used a completely different rationale for saying that automatic roaming was not an issue. It was in fact using something akin to a waiver analysis that Judge Elrod just asked me about. But that is not what the Commission did. The Commission's decision and we challenged that in our application for review. We said the Bureau decision makes no sense. It is clear from our application and our second amended petition and our evidence and our briefing that of course we are seeking automatic roaming for purposes of us providing the PSTN function. The Commission did not adopt the Bureau rationale on the automatic roaming question. It came up with an entirely new theory that had not been advanced by either party or the Bureau. It invented out of thin air this factual finding that AT&T was going to be providing the Internet when, as I noted a minute ago, the record is absolutely clear it will not. We did not ask for the Internet portion. We always said we would supply it. AT&T never offered to supply the Internet portion and nobody ever said that they would. It's clear they will not. Therefore, we think... Where in the record can we see what you asked for originally and how it got misconstrued? Our second amended complaint and the legal analysis which is part of it, along with our reply to AT&T's answer, our second amended complaint and legal analysis can be found in Joint Appendix 5, 6, and 7A through 7F and our reply to AT&T's answering submission can be found in 8A to 8F. We also stated that, I believe, in both of our briefs to the Bureau and in our application for review. But I know for a fact in our live pleadings, the second amended complaint, that was made perfectly clear, especially in the legal analysis. Your first form of relief that you seek is to be remanded so that the analysis can be MRS, basically. Yes, we would like for the Commission to be required to reconsider its order on the automatic roaming decision because its decision was based almost entirely on a finding of fact that has no evidence. You need to send it back so that they can, if they're going to maintain this position... Well, is it a finding of fact or is it of what you pled? Those are two different things. If it's a finding of fact, then we have to give a lot of deference, don't we? But if it's something you're pleading and they're misunderstanding, then we don't. Well, it may well be both. If you read paragraphs 4 to 7 of the Commission order, they state it as if it is a finding of fact. But it is also some form of an intermediate or legal conclusion because they use words that are defined in the Commission rules. They say we are buying mobile broadband internet access, terms that are defined in the Commission rules. And if you take a look at the little handout we gave, I gave this just in case we needed to refer to the rules, you will find on page 1 the definitions of both broadband internet access and mobile broadband internet access. The evidence is clear. AT&T is not going to be providing the internet. So it is a finding of fact and it is a mixed finding of law. Now with regard to whether we waived or requested this, that is a legal conclusion. And I think there is simply no way to objectively determine that we did not ask for automatic roaming as we defined it, whereby we provide the interconnections. Can you go back and ask for it now? Are you bound? I mean, if the court, I mean, if they concluded that you didn't even ask for it, then what's to keep you from asking for it today? Well, the process here leads to a contract. And that contract has been executed and is in force. It has provisions about when it is termed, when it can be renewed or canceled. We did reach an understanding that if the FCC or the court were to reverse that the contract would be renegotiated. I see I am very close to being out of time. I would be remiss if I did not at least mention our second point, which is the commercial reasonableness of the price. In very simple terms, this price is so high we can't use it. We have to pay AT&T more to use roaming than we can charge our end user. That simply cannot be commercially reasonable.  You have saved time for rebuttal. Good morning. May it please the court. My name is Maureen Flood and I am here this morning for the Federal Communications Commission in the United States. I want to start talking about… Why don't you move the microphone up a bit? Thank you, Your Honor.            Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I'd like to start by talking about our roaming rules. Our roaming rules provide for two roaming obligations. One is for voice roaming. The other is for data roaming. Now voice roaming is an interconnected service. It is interconnected with the public switch telephone network and it has to be provided on just and reasonable terms. Data roaming is not interconnected with the public switch network and it has to be offered on commercially reasonable terms. So the linchpin here is whether or not the roaming service is interconnected with the public switch telephone network. It is undisputed that Worldcall asked AT&T to provide a non-interconnected roaming service, what Worldcall calls RAN-only access. So the commission and the proceeding below determined that the roaming rates AT&T offered to Worldcall were subject to the commercially reasonable standard that applies to data roaming. Now Worldcall's interpretation of our roaming rule, which you can find in 47 CFR section 20.12, it's attached as pages 19 and 20 in our statutory appendix story brief, they misinterpret the rule. Worldcall argues that the service that Worldcall provides to its own customers defines AT&T's roaming obligation. In fact, the text of the rule, the history of the rule, and the structure of the rule all make clear that it's the service that AT&T provides to its customers and the nature of the roaming service that Worldcall requests from AT&T that determines AT&T's roaming obligation. So for example, if you look at rule 20.12, subsection D of that rule sets forth the voice roaming obligation, the obligation to provide roaming on just and reasonable terms and conditions. Only carriers that fall within the scope of subsection A2 are subject to that obligation. Now if you look at subsection A2, it says that the voice roaming obligation in D is applicable to CMRS carriers if such carriers offer real-time two-way switched voice or data service that is interconnected with the public switch network. So you only are subject to the voice roaming obligation when you provide interconnected services. Here, Worldcall requested that AT&T provide a non-interconnected roaming service. What it calls RAN-only access is effectively data transmission. It doesn't include internet access. It doesn't include interconnection. So under the text of the rules, it didn't fall within the section 20.12D voice roaming obligation. Instead, the commission has a different rule, the data roaming rule. And that's the rule that applies when a carrier like Worldcall asked a host carrier like AT&T for a roaming arrangement that does not include interconnection. And again, those type of arrangements are subject to the commercially reasonable standard that the commission applied in analyzing Worldcall's rate dispute with AT&T. Now our interpretation also finds support in the history of the rule. What's your response to the argument that the price is so high they can't use it? Our response to that is that, well, first of all, that argument was not raised before the commission. So it's waived. Worldcall only raised that argument before the Enforcement Bureau. And under Section 5C.7 of the Communications Act, filing an application for review with the full commission is a conditioned precedent to judicial review of an act taken on delegated authority here at the Enforcement Bureau's order. Putting that aside, Your Honor, it fails on the merits. When the commission adopted the data roaming rule, it stated that it was adopting the rule because it wanted to ensure competitive markets for roaming markets, because competitive markets benefit consumers. We weren't concerned with the impact on particular carriers. The evidence in the record showed that AT&T had dozens of roaming agreements with other providers. So it seemed to us that there was a competitive marketplace. Now, if we adopted Worldcall's view that a rate is only commercially reasonable if the requesting carrier can compete, there effectively is no standard at all, or it's a very toothless standard. And it renders obsolete the 17 different factors that we typically use to determine whether or not a rate is commercially reasonable. And those factors are set forth in paragraph 86 of the data roaming order. Now, turning back... So you're saying it's Worldcall's fault that they can't make it work? That could be it. I mean, it could be that Worldcall has a bad business plan. That's why the commission looks at, because we can't be in the business of looking at business plans and determining whether or not the rate is too high because the rate is too high, or Worldcall can't make a go of it because it has a poor business plan, and because fundamentally we're concerned about the impact. Roaming is a service that benefits consumers. From our perspective, so long as consumers are able to get roaming service at reasonable rates from multiple providers, our work is done. We don't care about Worldcall in particular. What about the fact that AT&T's rates are so much higher than the other providers? Should the court take into consideration that? Well, the record evidence showed that AT&T's roaming rates were higher than the rates offered by an alternative provider, than an alternative provider offered Worldcall. You should not take that into account, Your Honor. Why not? Isn't that relevant to commercially reasonable? What other people would? Well, it is and it isn't, Your Honor. So actually the fact that Worldcall can get service from this other provider should alleviate your concern about AT&T's market power. Now the availability of roaming service from other providers, that's one of those 17 different factors that we consider when determining whether a rate is commercially reasonable. But it actually cuts against Worldcall's argument. If Worldcall can purchase roaming service from another provider, AT&T has less leverage. Worldcall, on the record, did not explain why it was so dependent upon AT&T's roaming service. If Worldcall has an alternative in most situations, AT&T has, again, less leverage over it and less ability to charge super competitive rates. Does the Court have any questions? I can turn back to the standard that applies or we can talk about, I can talk more about the reasonableness of the rates. I'm sorry. The point that you just made is like there is no need for rules if there is competition. No, Your Honor. Our rules, from our perspective, commercial reasonableness is a range of rates. Commercial reasonableness is defined as so long as rates are not so high that there's no roaming, that no one can provide or very few carriers can provide, can roam on AT&T's network, that's the high end. If they're so high that no one's roaming or very few providers are roaming, that's too high. At the bottom end, we don't want rates to be so low that carriers like Worldcall depend on AT&T's roaming service rather than extending their own network facilities. And everything in between is presumptively commercially reasonable. When you have a dispute between a carrier like Worldcall and AT&T, we look at the individualized circumstances, we determine on a case-by-case basis whether or not the rates are commercially reasonable, and we apply those 17 different factors. And here what the evidence showed, and this gets a little sticky because a lot of this was redacted, so I have to be careful about what I say in open court. But if you look at the evidence in the Enforcement Bureau order, it goes on at length talking about the fact that AT&T had a number of agreements with other small wireless carriers, rural wireless carriers. They were making a go of it. It seemed as though there was a competitive marketplace and that there was substantial evidence in the record to support the Commission's finding that AT&T's rates were commercially reasonable. But there's also evidence in the record that small people can't make it in this market with AT&T and Verizon, too. I'm so sorry to interrupt. All Worldcall can point to are comments filed by a handful of carriers before the Commission issued the data roaming rule. Actually, I'm sorry, not before the Commission issued the data roaming rule, but before we how it could be implemented. And what those comments said generally was that the rates AT&T and Verizon were charging were too high. Well, you know what? Everybody wants to pay a lower rate. Right, but the small people are exiting the market. The T-Mobile and others are having to exit. T-Mobile. Or not T-Mobile. They're not small, but they refer to small people exiting the market. They refer to small people exiting the market, but the evidence, so those were just assertions that some people are leaving, some carriers are leaving the market, but the record evidence showed that AT&T actually had a number of wireless agreements with With small people as well as big people. Absolutely. If you look at footnote 78 of the Enforcement Bureau order, Your Honor, there the Commission rejected, I'm sorry, the Enforcement Bureau rejected Worldcall's argument that it couldn't with rural providers, that they have viable business plans relying on AT&T's roaming service. Those are small rural wireless providers. Can you address the Texas retail rate cap, please? Absolutely. If Worldcall believes that, the Commission cannot tell Texas how to set a rate cap for purposes of state rate making. But the Commission, so if Worldcall believes that AT&T's roaming rates are so high that it pushes its retail rate above Texas' rate cap. Do you disagree that it does? I don't know, Your Honor. Worldcall never made that argument to the Commission. That argument appeared for the first time in its brief. So I don't have a Commission response to that argument on the merits because we never had an opportunity to respond to it. So it's barred under Section 405 of the Act. But putting that aside, again, the Commission, when we adopt our roaming rules, we're concerned with competition in the marketplace. And there's no evidence that in the markets that Worldcall serves, that wireless customers cannot get access to roaming services. Again, this goes back to the fact that it might be that Worldcall's business plan is not viable. But that's not something that we're concerned with. Again, roaming is a service for customers, and there's no evidence that customers in those markets can't get access to roaming. I would also point out that there was substantial evidence in the record that the rates AT&T – first of all, that AT&T did have a number of roaming arrangements with other carriers, including carriers that were complaining that AT&T's rates were too high. Going back to those comments, those carriers in the comments, Worldcall's sites, many of them had arrangements with AT&T, but also the Commission can't take a blanket assertion without any rate evidence that rates are too high. The way we look at whether or not a rate is commercially reasonable is to, on a case-by-case basis, analyze the specific rates based on the factors in the data roaming order and any other relevant factors. So the fact that a small wireless carrier is telling the Commission, I can't make a go of it without putting any evidence in of the rates that AT&T is charging, or the circumstances of its arrangement with AT&T, is not enough for the Commission to find that the rates AT&T charges Worldcall are too high. If nobody else has any questions about the rates, I want to go back to the A2 and D issue. Under Worldcall's view, as I understand it, A2 states that D is applicable if such carriers offer real-time two-way switch voice or data services that is interconnected with the public switch network and also utilizes a network switching facility, etc. And you read from part of that earlier. And so their view, I think, is that it applies to the whom D applies. The whom is answered by A2, and then the what is answered by D, which is the host carriers in the relationship must provide automatic roaming to any technologically compatible facilities-based CMRS carrier on a reasonable basis. Right. Okay. So first of all, the who what argument is not before the Court because it was never raised before the Commission, but it also fails on the merits. What Worldcall is trying to do here is delink A2 and D and A3 and E. And what that effectively does is it reads out the distinction between interconnected and non-interconnected services in the rule. Under Worldcall's interpretation of the rule, if AT&T is a CMRS carrier, if it's providing interconnected voice services, it falls within the scope of A2. Of A2. Of A2. Right. And then it says it has, when it provides roaming, it's therefore subject to D. The problem with that is that Worldcall saying when AT&T falling under A, the problem with that is Worldcall saying when AT&T is providing a non-interconnected roaming service, it's still subject to the voice roaming obligation in D. The problem with that is when AT&T provides a non-interconnected roaming service, it's not a CMRS carrier. CMRS carriers by statute provide interconnected services. This is set forth in Section 332 D1 and D2 of the Communications Act. Isn't AT&T always a CMRS carrier? No, they're not, Your Honor. Why not? Because by statute, you are a CMRS carrier when you provide interconnected services. If you are not providing interconnected services... But it does provide interconnected services. It's not to these people, but they do provide those services. That's correct, Your Honor, but your status is based on what you are providing. Where does it say that? It says that in Paragraph 29. It says that in the Communications Act in Section 332 D1 and D2, but this distinction is made. I would point the Court to Paragraph 29 of the 2007 roaming order, which dealt with voice roaming, and then the 2011 data roaming order. In Paragraph 29 of the 2007 order, we said, and this is where we adopted the rule. Paragraph 29, it says, we determined that a reasonable request for automatic roaming will be limited to real-time two-way switched voice and data services provided by CMRS carriers that are interconnected with a public switch network and utilize an in-network switching facility. So we're saying there, this obligation only applies to CMRS carriers when they are providing CMRS services. In the same order, we said the obligation does not apply to non-interconnected services. In Paragraph 41 of the data roaming order, and I think this is really what makes the point, Your Honor, we acknowledge that commercial mobile data service providers, AT&T when it's providing non-interconnected services, that they sometimes also provide commercial mobile radio services. Okay, I think your time has expired and you've answered my question. Thank you. Thank you. Good morning, Your Honor. Paul Zudlicki on behalf of AT&T Mobility. I guess I'll start where my co-counsel Anne did. On the question of which rules apply, I think Worldcall focuses on subsection D, but they missed the first three words of the provision, which says upon reasonable request. And then the commission answered what does upon reasonable request mean in the voice order, and that was Paragraph 29 of the voice order. And it concluded that because you are a CMRS carrier, that doesn't mean you have to provide everything on a just and reasonable basis. It means that you only have to provide those services that you interconnect with a public switch network. Paragraph 29 is specifically referenced in the commission's order that's on review. That's Paragraph 6, Note 15. They referenced it's the CMRS rolling order, 22 FCC 15829, Paragraph 29. So on this jurisdictional question, I think the commission answered the question that was presented by WCX below, which was how do you determine whether or not a service that is provided is just and reasonable? Do you look at what AT&T is providing, or do you look at what WCX tacks on? And it's quite clear that the commission resolved that to conclude that no, you look at what AT&T is providing, not what's tacked on. And this makes sense not only based upon the text and language and history, it makes sense in the sense that if AT&T is providing a non-interconnected service, it never knows what WCX is going to be doing with that service. So under WCX's argument, AT&T would be subject to two different standards and would have no idea when one standard applied or another standard applied. And that too is reflected in Paragraph 5 of the commission's order. I think the commission got this right, and certainly this interpretation of its regulations is correct and should be afforded deference. On the question of the commission's analysis of the rates, the commission engaged in a very detailed analysis of all the arguments and all the evidence, and there was a lot of evidence. AT&T put in an analysis of dozens of its agreements. These are the agreements that it had access to and showed that the rates that it was offering were comparable to those rates. And so the commission properly concluded that that was persuasive and was more persuasive than one agreement that WCX was able to identify. The commission explained that that one agreement wasn't controlling  And two, the commission acknowledged that WCX's position was that that other carrier system wasn't as good as AT&T's, so it made sense that WCX would value AT&T's system more so. With regard to the question of whether WCX can compete, again, the commission analyzed that question. The Enforcement Bureau in footnote 78 looked at this closely, looked at the evidence that was presented, looked at the fact that there were other providers in the CMA that were, in fact, competing, and the fact that AT&T had agreements with rural carriers, small rural carriers, and AT&T was paying the same roaming rates that those carriers were paying. And that's in Austin, Houston, and San Antonio? Yes. The rural areas adjacent to those. There's two parts to that, Judge Allrott. The first part is that there were other comparable providers in that CMA. And so the fact that WCX may or may not be able to compete, that that wouldn't have an impact on competition. And that's what the rule was designed to. The other agreements that AT&T had were with rural carriers, comparable rural carriers all throughout the country. So it wasn't necessarily CMA. So you're not sure whether it works in that rural area? Well, we were limited by the information we had, and the information that we had the commission found persuasive and found that it appears that we have these agreements with dozens of other carriers, and lo and behold, those carriers are able to compete or appear able to compete. Within the Texas rate limits? So the Texas rate limits, one, that wasn't presented. And truth be told, if it were presented, it's not clear to me how WCX could compete, period, under that limit. Because the way they've described it, and just to – I'm sorry, my time's up. Can I finish? You can answer the question. So WCX's position is that the going retail rate is $10 per gigabyte, right? And under their business plan, they have – all of their users are going to use 20 gigabytes. And so under the going rate, assuming that theirs is similar to the going rate, it would be $200. That would be the going rate. And that's twice what they allege is to be the Texas plan. That has nothing – that's separate and apart from any cost of roaming to us. I don't think they – I mean, under their own plan, I don't think it would work. Their problem with the Texas is – Let me answer the question. Thank you, Ron. I'd like, if I could, to start off with the data roaming price issue. Are you all just a business destined to fail? I beg your pardon? Are you all just a business destined to fail? Because that's essentially what counsel opposite are saying. Well, no, we are not a business destined to fail. A great and very important thing about successful businesses, especially those that are regulated, is the extent to which regulators allow them to compete and see to it that they can compete. Or, on the other hand, purposefully strangle them on behalf of larger incumbents who seem to control the process. If the commission had followed its own rules, if it had paid attention to its own criteria in the data roaming order, if you take a look at the handout I did, pages 17 to 18, this notion that the impact on World Call Interconnect was irrelevant is simply not correct under the data roaming order. One of the criteria is the extent and nature of provider's build-out. Another, the impact of the terms and conditions on the incentives for either provider to invest in facilities and coverage, services and service quality. That clearly asks for the commission to take a look at the impact on World Call on its ability to compete under the proposed roaming price. And if you take a look at some of the other paragraphs in the data roaming order, they explain very much why they put in that criteria. Paragraph 15, even where providers have invested in and built out broadband networks in a regional service territory, a service provider's inability to offer roaming easily can deter customers from subscribing. It found in paragraphs 17, 18, 20, and 30 that the very purpose of the rule was to allow individual and especially rural providers to offer nationwide roaming, including data roaming, so that they could attract customers, compete with the large providers, and use the revenue to finish the build-out in their own areas. And so the notion by the Enforcement Bureau, affirmed by the commission, that the individual impact on World Call is irrelevant is simply not consistent with the very stated 17 criteria in the data roaming order, paragraph 86. If you take a look at them, it is clear that commercially reasonable, as the commission imagined it in the data roaming order, obviously had to consider both the interests of the vendor, here AT&T, and the interests of the buyer, here World Call. If World Call cannot offer service, nationwide seamless roaming service, because it is paying AT&T more for the roaming piece than it can charge for the entire piece, then World Call cannot compete, it cannot attract customers in its area, it cannot receive revenues, and it cannot finish the build-out of its network. So to the extent World Call might be at risk of going out of business, it would be purely because of what the commission did here, by completely failing and refusing to apply the stated criteria in its rule. The commission did not do what it said it would do, which is consider the commercial reasonableness of alternatives. We presented one. It was not a nationwide solution. It was only parts of the country. We still needed AT&T for the rest of the nation. The commission rejected consideration of that price as even relevant to the commercial reasonableness question. Further, the commission refused to consider WCX's impact evidence, and rejected out of hand without real consideration, the evidence that we offered about the other 11 carriers, there are only 11 carriers with whom AT&T has LTE contract. Remember, World Call is LTE only. We do not have the old-style generation network. So yes, AT&T has lots of agreements, but only 11 were for LTE. Virtually every single one of those carriers, at the time we were doing our complaint, were at the commission saying, we sure are sorry we signed this horrible contract. We cannot offer data roaming. We cannot offer it. We are having to restrict internet. We are going out of business. We are having to sell purely because of the price we had accepted. One last thing, we did answer most of the questions, especially those on waiver or non-presentation to the commission. If you take a look at our reply brief, page 31, we addressed the commission and AT&T's arguments that we did not preserve these matters before the AFR. I do need to remind you that especially on the automatic roaming question, the question resolved by the commission was different than the one resolved by the Bureau, and that's why some of the arguments in the AFR seem sideways with what the commission ultimately did. We did preserve this. We did raise it. We did ask for it. We presented evidence. The commission refused to consider it, and it's based its decision entirely on AT&T's interest rather than the interest of Worldcall and its real customers. We ask that you reverse. Thank you.